THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KURT J. ANDERSCH, Defendant-Appellant.

First District (5th Division)    No. 80-2887

Opinion filed June 11, 1982.—Rehearing denied August 6, 1982.

Steven Clark and Richard F. Faust, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David L. King, and Raymond Brogan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MEJDA delivered the opinion of the court:

Defendant Kurt Andersch was charged by information with the murders of Richard Hollis and James Kiley. Following a jury trial he was found guilty of two counts of involuntary manslaughter and was sentenced to two concurrent two-year terms in the Illinois Department of Corrections.

Defendant appeals, contending that: (1) the prosecution made prejudicial comments during closing arguments; (2) the State failed to prove him guilty of involuntary manslaughter beyond a reasonable doubt; and (3) the trial court erred in refusing to permit defendant to introduce his statement to police in its entirety during redirect examination.

Richard Hollis and James Kiley were fatally shot at the La Grange Y.M.C.A. in the early morning of October 16, 1979. Erbie Scott testified

that on October 15, 1979, he resided on the fifth floor of the Y.M.C.A. At 6:30 p.m. he was in the company of victim Hollis, Vito Mason, "Little Ed," Ronald Tripamer and Ronald, Jr. at a restaurant. This group sat at the bar drinking beer, watching television and talking until midnight. After a brief snack at a carry-out restaurant, he and Hollis purchased two six-packs of beer at a tavern where they met a stranger, who turned out to be Kiley. At 2 a.m. Kiley offered Hollis and Scott a ride to the Y.M.C.A. Scott and Hollis then invited Kiley, who had a 1/2 pint of whiskey, to join them at the Y.M.C.A.

The three men went to the fourth floor of the Y.M.C.A. Scott and Hollis knocked on the door of Vito Mason's room. Mason did not answer even after Scott continued to knock and call his name "louder and louder." Ronald Tripamer, Ronald, Jr., and Sam appeared on the scene. The then assembled group began to drink and laugh while Kiley passed around his 1/2 pint bottle. Suddenly Andersch came into the hallway with a rifle in his hands and said, "If you fellows don't be quiet, I am going to shoot." Scott then replied, "You son-of-a-bitch, if you are going to shoot, go ahead and start shooting." Scott casually approached Andersch who, when at a range of 15 feet, withdrew, backing toward his room, which was located in a dead-end hallway. Scott continued toward Andersch's room where Andersch stood at the doorway with a weapon at his hip, pointed straight ahead. Scott apologized to Andersch for waking him and offered him a beer. Andersch used the rifle barrel to poke Scott in the stomach. As Scott stepped aside, Sam approached and asked, "What's going on?" After someone said, "Put down the pump gun and have a beer," Andersch fired what sounded like two fast shots. As Scott froze against the wall, he heard someone say, "I'm hit."

Prior to the shooting Scott stood within "touching distance" of Andersch at the threshold of his room. When the shot was fired, Scott was standing face-to-face with Andersch. Six people were in the hallway prior to the shooting, but Scott had "no knowledge of who was where," including Hollis and Kiley, when the shot was fired. Scott testified that no one held a bottle at the time of the shooting, and that he didn't see any broken glass on the threshold of the apartment. Scott drank seven to nine bottles of beer and two "drinks" of whiskey that night, but stated that neither he, Hollis, nor Kiley were intoxicated.

Ronald Tripamer testified that on October 16, 1979, he was residing in room 405 at the Y.M.C.A. He and his son, Ronald, Jr., had joined Mason, Hollis and Scott at a restaurant lounge. After midnight Hollis and Scott went for more beer. Meanwhile he returned to the Y.M.C.A. along with Mason and his son, stopping along the way at a carry-out restaurant. He and his son returned to his room. Ninety minutes later Sam came to visit them, bringing four beers which he split with the witness. Another 90

minutes elapsed when he heard Scott yelling for Vito Mason and pounding on Mason's door. He, Ronald, Jr., and Sam walked to room 412, Mason's room, where they saw Scott, Hollis and a stranger who was introduced to them as James Kiley. Kiley had a bottle of "Seagram's 7" and passed it to everyone.

Tripamer stated that the group was talking and drinking when suddenly he heard someone yell, "Hey! Shut up down there." Tripamer and his son began walking back to his room while Hollis, Scott, Kiley and Sam walked towards the elevator. Then, he heard a loud blast and saw a big cloud of smoke from around the corner, whereupon he and his son ran to their room. He stated that he drank about six to eight beers on the evening of the incident.

Steven Sang, who resided in room 430 of the Y.M.C.A., testified that he was awake at 3:35 to 3:40 a.m. on October 16, 1979, when he heard loud, drunken-sounding voices emanating from a nearby elevator. Next, he heard a resident's door open and a "disturbed and upset" voice say, "Do you guys know what time it is?" A second voice responded angrily, saying in effect, "Do you want to say that to me up front?" Within a few seconds Sang heard a gunshot and an echo in reverberation of the noise in the hallway, followed by moans. Sang's door was not opened during the incident and he did not see the occurrence.

Lieutenant Jerome Tesmond, La Grange Police Department, testified that at 4:30 a.m. on October 16, 1979, he was called to investigate the shooting. He observed the bodies of Hollis and Kiley. Kiley's hand grasped a plastic whiskey bottle top. Nearby was a paper bag wrapped in a bluejean jacket containing two six-packs of beer. Tesmond observed fragments of a broken whiskey bottle in the hallway adjacent to Mr. Andersch's room. One small fragment of glass was found six inches inside the doorway. In Kiley's rear pocket Tesmond found a sheathed sporting knife.

Officer Tesmond recovered a 30-30 caliber Winchester lever-action rifle from Andersch's room, and two boxes of silver-tipped hunting ammunition, the type that expands, or mushrooms on impact. The desk drawer containing this ammunition was closed. Inside the rifle chamber Tesmond found one expended shell casing and two silver-tipped rounds in the loading tube. The rifle was designed with more than one safety mechanism. When the rifle is cocked, by hand-operating the lever, the breach block slides open, giving the user a full view of any ammunition present in the loading chamber and firing chamber. Tesmond demonstrated the operation of the weapon for the jury and testified that when a cartridge is in the rifle, it is more difficult to lever than when it is empty. He also stated that the rifle could not be fired by pulling the trigger alone, but that the lever strap must also be squeezed up against the pin.

The stipulated testimony of Dr. Yuksel Konakci, a forensic patholo-gist at the Cook County Medical Examiner's Office, was admitted into evidence. Dr. Konakci examined the bodies of Hollis and Kiley. The examination of Richard Hollis revealed an entrance wound at the left lateral aspect of the back. The examination of Kiley revealed three entrance wounds at the upper left chest. In Dr. Konakci's opinion both men died from bullet wounds to the chest.

Merrill Schepro, a resident and employee of the Y.M.C.A., testified that at 3 a.m., October 16, 1979, he was in his room, number 426, at the Y.M.C.A. listening to music over his headphones when he heard a commotion outside in the hallway. He opened his door and saw Scott and four other people standing in the hallway yelling. Then he saw Scott knock on the door of room 423. Andersch opened the door and asked Scott and the group if they knew what time it was, and told them he wanted to be left alone so he could sleep. Scott told Andersch that he would return and then the group left momentarily.

About five minutes later the group returned, this time with two other people. Schepro followed them to Andersch's door. Scott knocked on the door and Andersch opened the door and asked what they wanted. Scott replied, "We're back. Let's see you start something now." Then the group went into defendant's room "in a kind of wave," like "gatecrashers." Andersch picked up a rifle and used it to push Hollis, who was in front of the group, out of the room. Hollis said, "You better put that BB gun away, mister, or you're gonna [sic] get hurt." Hollis then grabbed the end of the barrel of the rifle with both hands and tried to jerk it away when the gun went off. The gun was pointed at Hollis when it fired. Schepro stated that both Hollis and Scott had entered Andersch's room before the gun discharged. Scott was unarmed, but Hollis cradled a bottle in his hands. Seconds before Hollis grabbed the gun barrel, Schepro heard glass break near Andersch's doorway.

Schepro gave a written, signed statement to Officer John Nusl shortly after the occurrence. According to the statement Schepro was listening to his headphones in bed when he heard two shots, then two more shots. He opened his door and saw the dead victims in the corridor. After this, Schepro went down to the hotel desk where he met the defendant. Defendant told him that he had killed the men and Schepro replied, "I didn't know that." Schepro also testified that this statement was signed by him under duress, explaining that Gary Ottaviano, a high ranking official of the Y.M.C.A., threatened him with the loss of his job if he made any statement to the police.

Schepro further testified that he had also made a statement to Ser-geant Wade of the La Grange Police Department on September 10, 1980, in which he stated that he saw only two people at defendant's door when

he first looked out, then they returned with three or four more people. Schepro also spoke to Thomas Gambino, the defendant's investigator, on three occasions. He told Gambino that he saw Scott and the others at 1:30 a.m. and next saw them at 2:30 a.m. banging on doors. He also said he had a conversation with the group outside his door. Schepro told Gambino that Hollis, who was cradling a bottle, pushed the rifle barrel to the side and the gun went off.

Defendant testified that he lived in room 423 of the Y.M.C.A. on October 16, 1979. After midnight he was asleep when a lot of noise in the hallway woke him up. Once the noise abated, he retired again, only to be reawakened by more noise at 3:30 a.m. Having unsuccessfully tried to ignore the noise he dressed and left his room. He saw three or four adult men grouped in a small circle about 70 to 80 feet down the corridor. He asked them to "hold it down" but received no positive response. He went to his room and then returned to the hallway with a rifle at his hip in order to "bluff" the noisemakers into silence. To the best of his knowledge his rifle was unloaded. The group turned and walked towards him. He "levered" his rifle to emphasize his bluff and said, "I mean business." The men, however, continued towards him in an unfriendly manner. Defendant then returned to his room intending to sleep. Defendant stood in his doorway and the men turned the corner into the "cul de sac" outside of his room. He stopped inside his room and laid his rifle against a wall. After a few seconds Scott, Hollis and Kiley stood at the room's threshold. Defendant asked, once again, for quiet but Scott said, "if you want to live here, you ought to get used to this kind of noise." Scott then moved closer with a whiskey bottle in his right hand, advancing to a point where defendant could no longer close his door. Defendant retreated, grabbed his rifle and told the group to leave, whereupon Scott, with Hollis and Kiley pushing against his body, lunged forward with his bottle. Defendant thrust his rifle against Scott's chest to repel the invasion. Then, as defendant pulled the gun back, unexpectedly, the weapon fired.

Defendant also testified that he had not fired the rifle, a collector's item, for over six years prior to the shooting. It was Scott's threatening thrust with the bottle which caused him to reach for the rifle, and he pushed the rifle at Scott to counteract what he considered to be a certain blow to his head by the liquor bottle. As the bottle hit the rifle and broke, defendant's lunge moved him past Scott. When he pulled back, it seemed like the hammer of the rifle had caught something. His finger must have been on the trigger but he did not think it was at the time. He said that Scott reached for the rifle but he saw no one pull the rifle. He thought that he had removed any bullets from the rifle prior to October 16, 1979. He could not tell by picking up the rifle if it was or was not loaded.

Everett Eldridge and Robert Kiefer, who had known defendant for

many years, testified that defendant was a peaceful and law-abiding citizen, having a very good reputation in the community.

The stipulation of Dr. John Spikes and Dr. Michael Schaffer, forensic pathologists, established that the blood alcohol levels of Hollis and Kiley were substantially in excess of the statutory level of intoxication (0.100 ethanol) at the time of their respective deaths.

Gary Ottaviano, a program executive employed by the Y.M.C.A., testified that he did not converse with Schepro until a couple of days after the incident when he observed him talking, while on duty at the front desk, to Y.M.C.A. residents about the shooting. Ottaviano told Schepro to desist from talking about the incident while on duty. He testified that he never told Schepro not to tell anyone about the incident.

OPINION

Defendant first argues that statements made by the prosecutor during her rebuttal argument denied him a fair trial. The first remarks complained of are as follows:

> "The defendant is presumed innocent, however that presumption does not continue once you go into the jury room and deliberate. At that time you review the testimony of each and every witness * * * in this case, and when you do review that testimony you will see that the cloak of innocence that the defendant has surrounded himself has been stripped from him, and at that point in time I think you will reach the correct decision, that is, that he is guilty of the crime of murder."

■■ Basic to our system of criminal justice is the concept that the presumption of innocence remains with the accused at every stage of his trial. (*People v. Balls* (1981), 95 Ill. App. 3d 70, 419 N.E.2d 571.) Therefore, the prosecutor's comment that "the presumption does not continue once you go into the jury room and deliberate" is clearly erroneous, and not to be condoned by this court. However, the trial court properly instructed the jury that the presumption of innocence remained with defendant "throughout every stage of the trial and during your deliberations * * *" and we therefore conclude that the jury was not misled on this point. *People v. Stokes* (1970), 46 Ill. 2d 325, 263 N.E.2d 21, *cert. denied* (1971), 401 U.S. 946, 28 L. Ed. 2d 229, 91 S. Ct. 965; *People v. Kurena* (1980), 87 Ill. App. 3d 771, 410 N.E.2d 277.

The second comment complained of is contained in the following colloquy:

> "[PROSECUTOR]: * * * and his attorney says, 'Well, he has a good reputation for being a peaceful and law-abiding citizen.' You got two people down here to say that Atilla the Hun could find two people that he knew.

[DEFENSE ATTORNEY]: That was uncontradicted testimony.
THE COURT: Sustained.
[PROSECUTOR]: As I said, anybody can get someone to come here and say they have a good reputation."

■■ Defendant, a German national, argues that the reference to Atilla the Hun, an infamous Germanic figure, was calculated to invoke ethnic or racial prejudice. Initially, we note that defendant did not object at trial to the comments on such grounds which, in our view, negates his contention of ethnic or racial prejudice. (*People v. Kelly* (1975), 25 Ill. App. 3d 753, 324 N.E.2d 82.) Although we think the comment was ill-advised in view of defendant's national origin, our examination of the record convinces us defendant has failed to show substantial prejudice as a result of the assailed comment (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200), and has failed to show that the comment constituted a material factor in the conviction. *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

Defendant next argues that reversible error occurred as a result of the prosecutor's rebuttal comments, exemplified by the following:

"Well, the Defense Attorney came up here and said to you a few moments ago that he was surprised at Merrill Schepro's testimony. And I cannot believe that he would actually say that to you. Everything that Merrill Schepro said, this Defense lawyer knew he was going to say * * *. So he knew at that point in time that Merrill Schepro's testimony was not true."

■■ In defense of the complained-of rebuttal comments, the State contends that they were proper argument, invited by comments made by defense counsel, which did not result in any substantial prejudice to defendant. Initially, we do not find that the comments accuse defense counsel of suborning perjury so as to require reversal on such grounds. (See *People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19.) Moreover, following each complained-of comment, the trial court sustained defendant's objection and ordered the remarks stricken, in our view sufficiently curing any prejudice. (*Baptist*.) In addition, we have considered the cumulative effect of the above rebuttal remarks and hold that defendant has not shown that he was so prejudiced that he was denied his right to a fair trial.

Defendant next argues that he was not proved guilty of involuntary manslaughter beyond a reasonable doubt. He contends that his conduct was not reckless, maintaining that he did not know the rifle was loaded, and further that the shooting was the result of an accidental and therefore "unconscious" act. *People v. Spani* (1977), 46 Ill. App. 3d 777, 361 N.E.2d 377.

Section 4—6 of the Criminal Code of 1961 defines recklessness:

"A person is reckless or acts recklessly, when he consciously

disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow * * * and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1979, ch. 38, par. 4—6.

■■ The question of whether a person is proved guilty beyond a reasonable doubt of involuntary manslaughter questions the jury's determination of whether defendant recklessly performed acts which caused death, and its determination on this issue should not be disturbed unless the jury was unjustified in arriving at its finding of recklessness. (*People v. Schwartz* (1978), 64 Ill. App. 3d 989, 382 N.E.2d 59.) It is settled that pointing a loaded weapon at another constitutes recklessness since it is a gross deviation from the standard of care exercised by a reasonable person. (*Schwartz; People v. Moczarney* (1978), 65 Ill. App. 3d 410, 382 N.E.2d 544.) Defendant attempts to avoid this principle on several grounds. First defendant maintains that he did not realize the rifle was loaded. However, the trier of fact could have properly determined that the defendant acted recklessly in not checking the condition of the weapon prior to the incident. (*Schwartz.*) The jury heard the testimony of Lieutenant Tesmond regarding the loading and operation of the rifle, and its various safety mechanisms. The defendant cocked the lever, thus bringing the loading chamber into full view, and pointed the barrel at, or in the direction of, the victims. The jury, therefore, could have concluded that under the circumstances, defendant's conduct was reckless even if he believed the weapon was unloaded.

■■ Defendant argues that discharge of the weapon was an accidental act, an "unconscious" act and therefore did not involve the requisite mental state of recklessness. This argument, however, confuses reckless conduct with the risks or results that are the natural products of such acts. Moreover, the question of whether a shooting is the result of accident or by reckless conduct is in the province of the trier of fact. *People v. Kelly* (1975), 24 Ill. App. 3d 1018, 322 N.E.2d 527.

Defendant maintains that his conscious acts were done lawfully in self-defense and that the shooting was an accidental outgrowth of such lawful conduct. He claims that he used what he thought was an unloaded rifle to repel an invasion by a "horde of drunks into his residence." A review of the evidence, however, dispels defendant's illustration of a threatened person defending his life and property, and instead depicts a scene in which an angry bluff precipitates a deadly confrontation at the threshold of defendant's door. Defendant's testimony established that he clearly threatened the unruly group by aiming and "levering" his rifle at them in the hallway. Defendant then retreated to his room, but did not

attempt to close the door. Rather, he chose to conceal his rifle in an adjacent room and stand in his door, even after seeing that the group was walking toward him in an "unfriendly" manner. A defendant cannot claim self-defense where the situation he encounters arises out of his own making. *People v. Echoles* (1976), 36 Ill. App. 3d 845, 344 N.E.2d 620.

Moreover, defendant's claim that he was threatened by the group is sufficiently refuted by the evidence. The defendant admitted that regarding Scott's physical stature, normally he "would not have been a match for me." Defendant also testified that when Scott stood at the door he "felt somewhat threatened. But not really that I thought I was." An element justifying the use of force in self-defense is that a person threatened must actually believe that a danger exists. *People v. Brumbeloe* (1968), 97 Ill. App. 2d 370, 240 N.E.2d 150.

Defendant argues that he used his rifle to "block blows with a bottle by his attacker." Schepro testified that Hollis cradled a bottle and Scott saw no one with a bottle. Although defendant claimed that Scott held the bottle, the uncontradicted evidence established that a whiskey bottle top was found in the lifeless hand of Kiley, who according to defendant's own testimony was standing in back of Scott. Moreover, the whiskey bottle that Kiley held shattered with all of the pieces except one landing outside the defendant's door, indicating that Kiley stood in the hall. It is noteworthy that the entrance wound to Hollis' back indicated that Hollis was not entering defendant's apartment at the time of the shooting. Further, Kiley was struck by bullet fragments exiting Hollis' body, establishing that Kiley was positioned behind Hollis and further eroding defendant's "onrushing horde" illustration.

■■ Having carefully reviewed the record we cannot say that the evidence is so palpably contrary to the jury's finding that we entertain a reasonable doubt of defendant's guilt of involuntary manslaughter. We believe that the jury could properly conclude that defendant's conduct was reckless and that the shooting was not an accidental outgrowth of justifiable conduct in self-defense. Under the facts and circumstances of this case, we hold that the State has not failed to prove defendant guilty of involuntary manslaughter beyond a reasonable doubt.

Defendant finally contends that the trial court committed reversible error by restricting defense counsel's attempt to rehabilitate him after he had been impeached by proof of his prior inconsistent statement. The prosecutor used portions of defendant's 21-page statement made by him to police officers on October 16, 1979, to impeach his testimony during cross-examination. During redirect examination, defense counsel sought to bring out defendant's entire statement to rehabilitate him. However, after the State's objection, the trial court ruled that only those portions of

the defendant's prior statement which might tend to explain, modify or reconcile any inconsistencies brought out in defendant's cross-examination testimony could be explored by defense counsel. Defendant contends that the trial court's refusal to allow defense counsel to use the statement in its entirety was reversible error.

■■ "[I]t is well settled that where a witness has been impeached by proof that he has made prior inconsistent statements, he may bring out all of the prior statements to qualify or explain the inconsistency and rehabilitate the witness." (*People v. Hicks* (1963), 28 Ill. 2d 457, 463, 192 N.E.2d 891, 894; *People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135.) The admission into evidence of any prior statement under this rule, however, is subject to the proscriptions of relevance and materiality. (*Walters v. Taylor* (1976), 36 Ill. App. 3d 934, 344 N.E.2d 765.) Thus, a portion of a witness' statement which is not a qualification or an explanation of the apparent inconsistency in the prior impeaching statement need not be admitted on these grounds. We therefore reject defendant's position that *Hicks* requires an "all or nothing" approach to the admissibility of his remarks to the police on October 16, 1979. Further, contrary to defendant's contention that the Federal evidentiary rules support his claim, we point out that Federal Rule of Evidence 106 provides for the introduction of "any other *part*" of a prior statement "which ought in *fairness*" be considered contemporaneously with the portion introduced. (Emphasis added.) (Fed. R. Evid. 106.) Accordingly, Federal court decisions have held that this rule is circumscribed by two qualifications: (1) the portions sought to be admitted must be relevant to the issue; and (2) only those parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted. *United States v. Walker* (7th Cir. 1981), 652 F.2d 708.

■■ Finally, we cannot conclude on the instant record that defendant was prejudiced by the trial court's ruling precluding admission of the entire text of his statement. The record shows that defendant was given every opportunity to explain and reconcile his inconsistent testimony. On redirect examination, defense counsel questioned the defendant thoroughly and extensively regarding the circumstances under which the statement was given, and he was allowed to introduce portions of the statement that explained or put his testimony into context. Moreover, defendant has not presented to this court a copy of the entire statement at issue. Since we are restricted in our examination of the record as it is (*People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862), we cannot conclude that any rehabilitating portions of defendant's statement were improperly excluded from evidence. From our review of the entire record, we believe that defendant received a fair trial.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.