THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BELINDA HOOVER, Defendant-Appellant.

First District (1st Division) No. 1—89—1919

Opinion filed June 21, 1993.—Rehearing denied September 21, 1993.

Rita A. Fry, Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald Lyman, and Eileen M. O'Neill, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

An indictment returned in the circuit court of Cook County charged defendant, Belinda Hoover, with the murder of Cynthia Barker. Following a jury trial, defendant was found guilty of involuntary manslaughter and sentenced to a prison term of three years. On appeal, defendant contends that: (1) the trial court erred in denying her motion to dismiss the indictment based on the State's failure to preserve evidence of 911 tapes; (2) the statement of Artie Davis implicating defendant in Barker's shooting did not provide probable cause for defendant's arrest; (3) she was not proved guilty of involuntary manslaughter beyond a reasonable doubt; (4) the trial court erred in refusing to answer the written questions of the jury during the jury's deliberation; and (5) the trial court considered an improper factor in sentencing her to a prison term rather than probation. For the following reasons, we affirm.

The record sets forth the following facts relevant to this appeal. On March 20, 1987, at approximately 7:30 a.m., police discovered the body of Cynthia Barker slumped in the front seat of a Ford Mustang automobile parked in front of 8420 South Marquette Avenue, Chicago. Police observed a single gunshot wound to the back of Barker's head.

At the time of her death, Barker's husband, Artie Davis, lived with defendant in a basement apartment located at 8429 South Marquette Avenue. Defendant had been living with Davis for about a year and a half.

PRETRIAL HEARINGS

Prior to trial, defense counsel moved to quash defendant's arrest and suppress evidence. At the hearing on the motion, Chicago police detective Michael Rowan testified that he began his investigation of Barker's death on March 21, 1987. At 3 or 4 p.m., he went to 8729 South Marquette and encountered Robert McCracken on the front steps. The detectives searched Robert and ultimately arrested him for a weapons violation. At that time, Davis and defendant accompanied the officers to the police station for questioning. Police drove defendant home at 2:45 a.m. on March 22, 1987.

Detectives interviewed both Robert and Davis. Detective Rowan stated that at this time, Davis was the main suspect in the shooting. Davis took and failed a polygraph examination. The examination revealed that Davis was not truthful when he stated that he did not know anything about Barker's death. Subsequently, Davis admitted that defendant told him that she shot Barker. Davis further stated that he and Ricky McCracken took the gun from defendant and disposed of it in Lake Michigan.

On March 22, 1987, Detective Rowan and the other detectives returned to 8429 South Marquette in the early afternoon, arrested defendant, her mother, Billie Mahaffey, and Ricky McCracken, Robert's brother, and transported them to the police station. At that time, defendant was given her *Miranda* warnings and she gave a statement to police.

At the conclusion of the hearing, the trial court denied defendant's motion. The trial court found that the police had probable cause to arrest defendant on the afternoon of March 22, 1987, based on Davis' statement that defendant had shot Barker.

Defense counsel also moved to dismiss defendant's indictment on the grounds that the State lost certain 911 tapes and that such evidence was material to defendant's case. The tapes purportedly contained telephone calls made to 911 by Ricky McCracken and Ronald Harris on the morning of March 20, 1987, reporting the shooting. At the hearing on the motion, Assistant State's Attorney Maria Gonzalez testified that on March 26, 1987, she prepared a subpoena *duces tecum* for the 911 tapes of the Chicago police department for the case of Belinda Hoover. The subpoena was typed by a secretary and re-

turned to Gonzalez on March 27, 1987. Gonzalez then sent the subpoena to the Chicago police department communications section.

Gonzalez testified that as far as she knew, the subpoena was never honored. She personally never received the tapes, and after she was transferred out of Branch 66, she checked with the secretary there, who told Gonzalez that there was no entry in the unit log book that the tapes were ever returned pursuant to the subpoena.

Barbara Lulkowski, the secretary in Branch 66, testified that when records are subpoenaed, a request slip is given to an investigator, who picks up the subpoenaed records and brings them to the State's Attorney's office. The subpoenaed records are then forwarded to the assistant State's Attorney assigned to the case. In this particular case, the tapes were never found.

Subsequently, on December 31, 1987, defense counsel attempted to subpoena the tapes from the police. At that time he learned that neither the police, the State's Attorney nor the court had possession of the tapes.

Defense counsel introduced into evidence a copy of a log from the State's Attorney's office. On the last page the date "4-10-87" was written in a column next to "People v. Hoover." The trial court found that there was no evidence that this notation indicated that the tapes were delivered and may in fact have indicated only that a copy of the subpoena was forwarded to the trial judge. At the conclusion of the hearing, the judge denied defendant's motion to dismiss the indictment. The court described the actions of the State's Attorney's office as "careless" and "sloppy" and noted that the State's subpoena procedure left a lot to be desired, but found that the State did not lose or misplace the tapes in bad faith. The court further concluded that the defense could obtain evidence of what was said on the 911 tapes by some other means.

THE TRIAL

At trial, Gwendolyn Jones testified on behalf of the State that on March 19, 1987, she lent her brown Ford Mustang to her cousin, Cynthia Barker. Jones stated that prior to that day, the automatic gear shift was not working properly and that the gears would stick when shifting. Jones stated that she used a screw driver to remove the gear shift cover, and then used the screwdriver to shift the gears. The screwdriver was in the car at the time Jones lent the car to Barker.

Chicago police officer Daniel McCarthy testified that he received a dispatch at 7:30 a.m. to investigate the nature of an injured woman at 8420 South Marquette. When he arrived at the scene, Officer Mc-

Carthy observed a Ford Mustang next to the curb. He noticed that the Mustang had struck the car in front of it and that its headlights were on and the engine running. He found a woman seated in the front seat of the car and determined that she was dead.

Chicago police detective John Duffy testified that he investigated the scene of Barker's death on March 20, 1987. At that time, he noted that Barker's hair toward the back, left side of her head had been pulled out so that it was standing out more than the rest of her hair. Barker had a bullet wound to the center rear of her head, and powder burns in the hair surrounding the bullet wound. On cross-examination, Detective Duffy identified a photograph taken of the interior of the Mustang, depicting a screwdriver lying on top of a purse on the floor of the passenger side of the car.

Dr. Robert Stein, chief Cook County medical examiner, testified that he performed an autopsy on Barker on March 20, 1987. Dr. Stein found a bullet wound in the back of Barker's head, approximately 5 1/4 inches below the top of her head. The wound was consistent with a gun being held at close range, directly to the back of Barker's head. Dr. Stein further found evidence of a pregnancy in Barker's right Fallopian tube. Dr. Stein determined the cause of death to be a gunshot wound to the head with a tubal pregnancy as a contributing factor. On cross-examination, Dr. Stein stated that the toxicology report revealed that Barker's blood contained a high level of cocaine and an alcohol content equivalent to two bottles of beer.

Ronald Harris testified that on March 20, 1987, he lived at 8411 South Marquette Avenue. At 6:30 that morning, he looked out of his window and saw a car parked across the street with its lights on and motor running. When he left the house to go to work shortly thereafter, he saw that the car was still there, so he crossed the street and saw a woman in the car who looked like she was sleeping. He said, "Hello, hello," but there was no response. Then he saw blood and said to his neighbor, "The lady has been shot. Call the police." When the police did not arrive, Harris called 911 himself. Finally, the police arrived, and a sergeant turned off the car engine.

Ricky McCracken testified on behalf of the State that on March 20, 1987, at approximately 5 a.m., he heard a car horn and then heard Davis' car alarm go off. At that time, Davis' car was parked directly in front of the two flat where Ricky lived with his mother, Ruby McCracken, in the second-floor apartment. Ricky testified that Davis lived in the basement with defendant, Ricky's cousin, and that defendant's parents, Billie Mahaffey and James Myers, lived in the first-floor apartment. Ricky went out to investigate the noise and saw

Barker in her car calling out Davis' name. As Ricky approached Barker, she drove off, making a right turn at 84th and Marquette. Ricky returned to the house and met Davis, Mahaffey and defendant in the living room. Ricky then heard the car return, coming through the alley at the rear of his house. He went to investigate, but by the time he got out to the alley, Barker had pulled around to the front of the house and started blowing her horn again. He did not go back outside.

Shortly thereafter, Ricky met defendant on the front steps as she was coming into the house. Defendant was shaking and he asked her what happened. Defendant replied, "I shot her. It just happened. It just went off." Ricky talked with Davis and Mahaffey about what they should do. Davis decided they should get rid of the gun. They decided not to call the police from the house because they did not want their phone number picked up on the computer. Davis and Ricky drove to 79th and Exchange Streets and at approximately 5:20 a.m., Ricky called 911 from a pay phone. They then drove to LaRabida Hospital at 67th Street, near Lake Michigan. Davis threw the gun into the lake, and then threw the bullets into the lake individually. After that, Ricky and Davis returned home. At about 6:30 a.m., Ricky left the house to go to work. At that time, he noticed that the car was still there, the lights were on and the engine was running. On cross-examination, Ricky testified that upon his arrest, he was told that he could go to jail for concealing or obstructing evidence of a murder.

Dr. Robert M. Moriarty, professor of chemistry at the University of Chicago, testified on behalf of the defendant that Barker had a high level of cocaine in her system at the time of her death, and that a tubal pregnancy was consistent with regular use of cocaine. Dr. Moriarty stated that the physical effects of cocaine are a rapid pulse rate and hypertension and the psychological effects are restlessness, irritability, inability to sleep, aggression, paranoia, paranoid delusion, combative behavior, and paranoid miscalculations.

Defendant testified on her own behalf that she began dating Davis in July 1985. In October 1985, defendant and Davis moved into a basement apartment with her young daughter from a previous marriage. On October 31, 1985, defendant received a telephone call from Barker. Barker stated that she was Davis' wife and then said, "I hope you have a nice ride to work." When defendant went out to her car, it was gone. Following this incident, defendant received a series of "crank" telephone calls, including "hang-up" calls and calls where defendant heard only breathing on the other end of the line.

The calls ceased for about seven or eight months. Then in April 1986, defendant became pregnant with Davis' child. Barker began to call defendant almost daily, threatening defendant and her baby, saying such things as, "hi bitch, how are you today?"; "I don't know what you think you [sic] doing with my husband. I'm never going to give my husband a divorce"; and that defendant "must be crazy" if she thought she was going to have a baby by Davis. During that same period of time, Davis related an incident to defendant wherein Barker arrived at Davis' place of employment and attacked him with a knife. On another occasion, Barker threw a steel garbage can lid at defendant.

In addition, defendant related several incidents where Barker followed her while she was driving her car. On one occasion, defendant was driving her children home from their grandmother's house, when she noticed that the wheels of her car were wobbling. When she got out of the car to investigate, defendant noticed that all the lug nuts to the car's wheels were loosened, and that one lug nut was missing. When defendant arrived home, she received a call from Barker asking if she had made it home all right.

On March 20, 1987, Barker called defendant at approximately 4:45 a.m. and stated, "put Artie on the phone, I want to talk to him now." Defendant asked Barker not to call her house at that time of the morning and hung up the phone. Barker called again demanding to speak to Davis, and when defendant's mother picked up the extension, defendant hung up the phone. Defendant stated that Barker sounded drunk. Barker then called a third time and told defendant to tell Davis that if he did not come to the phone, she would come over there to meet him at his car. About two minutes later, at 5 a.m., the alarm sounded on Davis' car, which was parked in front of defendant's apartment.

Defendant went upstairs, looked out of the window and saw a brown Mustang automobile parked in front of her apartment. Defendant then went back downstairs and got a jacket and her gun from between the mattresses of her bed. She put the gun in the right pocket of the jacket. As she was going outside, she saw her cousin Ricky walking toward the Mustang. At that point, Barker sped off down the street. Defendant turned off the car alarm and went back into the house.

By the time defendant got back to the house, the alarm was sounding again and she heard a horn blowing in front of the house. Defendant went back outside and found Barker parked across the street. Defendant crossed the street and approached Barker's car.

Defendant asked Barker to stop calling her house and coming by and disrupting the neighborhood. As defendant was talking, Barker rolled down her window. Barker then stated, "Well, I'm not going anywhere 'til my husband come out of here so you may as well just go get him." Defendant told Barker that Davis was not home, and Barker responded, "His car is here. I know he is here. If you don't go get him, I'm going to beat your ass." Barker then reached out and grabbed · defendant with both hands and pulled her into the car. A struggle ensued, and defendant attempted to break loose. Defendant grabbed Barker's hair with both hands, the gun was in her right hand and her hand was near the top back of Barker's head. Defendant saw Barker reach for a shiny object on the floor of the car on the passenger side and defendant thought it was a knife. Suddenly the gun went off and the car rolled forward.

Defendant got out of the car and ran into the house. She saw her mother and Ricky in the living room and told them that the gun had gone off and that she thought she shot Barker. Defendant's mother said they needed to call an ambulance. Ricky said he would make the call. Then Davis took the gun and he and Ricky left the house. Defendant's mother told defendant not to say anything about the incident.

The next day, at around 5 p.m., the police took defendant, Davis, Ricky and Mahaffey to the police station. Defendant was released at 3 a.m. on March 22, 1987. Later that day, the police returned at 2 p.m. and arrested defendant. Defendant was questioned at the station by Sergeant Rutherford Wilson. Sergeant Wilson told defendant, "I know you did it. Artie already told me it was an accident. He failed the polygraph test so you may as well just tell me what happened." Sergeant Wilson then told defendant that if she did not tell him what happened, she would get a sentence of the maximum years, her family would be locked up and she would never see her children again. Defendant then told Sergeant Wilson what had happened. Detective Duffy then came in and defendant was taken to an interrogation room.

At approximately 6 p.m., defendant made a statement, which was transcribed by the court reporter. Defendant was asked to read and initial the statement. Defendant made corrections to her statement and initialled them.

On rebuttal, Sergeant Rutherford Wilson testified that he never told defendant that if she did not tell what happened she would get the maximum years nor did he tell defendant that her family would be locked up and she would never see her children again.

Following closing arguments, the jury found defendant guilty of involuntary manslaughter. After a hearing, the trial judge sentenced defendant to three years' imprisonment. This timely appeal followed.

Initially, defendant contends that the trial judge erred in denying her motion to dismiss the indictment on the ground that the State acted in bad faith by mishandling the 911 tapes subpoenaed in defendant's case. Defendant argues that the tapes of telephone calls to 911 had exculpatory value and that the State purposely hid the tapes from the defense thereby denying her due process rights. Defendant seeks a reversal of her conviction and dismissal of the indictment on these grounds.

In *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333, the United States Supreme Court determined that unless a criminal defendant can show bad faith on the part of the State, failure to preserve "potentially useful" evidence does not constitute a denial of due process of law. This court has adopted the "bad faith" test set forth in *Youngblood*. See *e.g.*, *People v. Tsombanidis* (1992), 235 Ill. App. 3d 823, 601 N.E.2d 1124; *People v. Hall* (1992), 235 Ill. App. 3d 418, 601 N.E.2d 883; *People v. Young* (1991), 220 Ill. App. 3d 488, 581 N.E.2d 241; *People v. Stallings* (1991), 211 Ill. App. 3d 1032, 570 N.E.2d 820; *People v. Lampkin* (1990), 193 Ill. App. 3d 570, 550 N.E.2d 278.

■ In the present case, defendant has failed to show that the State acted in bad faith in failing to preserve the 911 tapes. The record here supports the trial court's findings that the State acted with "carelessness," and that its subpoena procedures were "sloppy," but the record does not contain any evidence of bad faith on the part of the State's Attorney's office. Rather, the record shows that the evidence was lost or misplaced in the process of complying with standard office procedure. *Cf. People v. Walley* (1991), 215 Ill. App. 3d 971, 575 N.E.2d 596 (State persisted in employing improper subpoena *duces tecum* procedure despite case law and recent warning to avoid such procedure).

Moreover, we are not convinced that the 911 tapes rise to the definition of "potentially exculpatory evidence." Where audio tapes have been lost or mislaid by the State, courts are not required to accept the defendant's speculative version of the favorable nature of the lost tapes to the defense. (*Hall*, 235 Ill. App. 3d at 428.) Courts also consider the defendant's opportunity to seek the lost evidence by other means. (*California v. Trombetta* (1984), 467 U.S. 479, 488-89, 81 L. Ed. 2d 413, 422, 104 S. Ct. 2528, 2534; *Hall*, 235 Ill. App. 3d at 427.) The record in the present case shows that evidence of the telephone

calls to 911 was obtainable through the testimony of witnesses at trial. We therefore hold that the trial court properly denied defendant's motion to dismiss the indictment.

Next, defendant contends that the statement of Artie Davis, implicating defendant in Barker's shooting, was insufficient to provide probable cause for defendant's arrest.

Whether probable cause to support a warrantless arrest exists is a commonsense, practical question to be determined by the totality of the circumstances. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Generally, probable cause exists when the circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe an offense has been committed and that the individual arrested is responsible. (Ill. Rev. Stat. 1985, ch. 38, par. 107—2(1)(c); *People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) In determining whether the officer had probable cause, the officer's factual knowledge based on his prior law-enforcement experience is sufficient. (*Tisler*, 103 Ill. 2d at 237.) Further, probable cause may be founded upon evidence which would not be admissible at trial and which need not be sufficient to establish guilt beyond a reasonable doubt. (*People v. Johnson* (1989), 187 Ill. App. 3d 756, 771, 544 N.E.2d 392.) In fact, even hearsay is proper grounds for establishing probable cause. Thus, an officer can relate data that was observed by another and told to him. Provided that the person supplying the data is a citizen-informer and not a police informer, the police do not have to establish the informer's prior reliability or to corroborate the information. *Johnson*, 187 Ill. App. 3d at 771, citing *People v. Beto* (1980), 86 Ill. App. 3d 622, 408 N.E.2d 293.

Moreover, even information from a suspect which implicates another provides sufficient grounds for probable cause if buttressed by corroborating evidence or by the officer's knowledge and experience. (*People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 988.) If a trial court finds that the police had such probable cause in a particular case, a reviewing court should let the finding stand unless it is manifestly erroneous. *People v. Brown* (1990), 194 Ill. App. 3d 958, 964, 553 N.E.2d 712.

In *People v. James*, a woman's body was discovered by the maintenance man at her apartment building. Police observed that the apartment had been entered through a broken kitchen window and that the woman was strangled. The maintenance man told the police that a man known as "Gigilo" had been at the victim's apartment several days earlier. Upon investigation, the police determined that Gigilo was Edward Meeks and brought Meeks in for questioning. At first,

Meeks denied involvement, then confessed and implicated James, stating that James had strangled the victim. Based on Meeks' statement, the police brought James into custody. Initially, James denied knowledge of the crime, then, when he was told that Meeks had implicated him, he admitted involvement and signed a written confession.

The supreme court ruled that Meeks' statements were sufficient to establish probable cause to arrest James. The court noted the requisite indicia of reliability of Meeks' statement was established by the facts that the information Meeks provided was corroborated by the officer's observations at the scene; Meeks specifically identified James; Meeks had not been offered any specific inducement for identifying James; and the police investigation provided independent verification of a substantial part of the statement. Based upon these facts, the *James* court concluded that "[t]o decide [that probable cause did not exist] would ignore the [United States] Supreme Court's admonition that the probable cause determination is a 'commonsense, practical question.'" *James*, 118 Ill. 2d at 225, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 230, 76 L. Ed. 2d 527, 543, 103 S. Ct. 2317, 2328.

■ In the present case, police discovered Barker's body in a Ford Mustang, parked across the street from defendant's home. Police observed a fatal gunshot wound to the back of Barker's head. Upon learning that Barker was married to Davis, police questioned Davis about the shooting. At first, Davis denied that he knew anything about the shooting, but after failing a polygraph test, admitted that defendant had told him that she shot Barker. Davis further admitted that he took the gun from defendant and disposed of it in Lake Michigan. Police did not offer Davis any specific inducement for identifying defendant. Based upon these facts, the police had probable cause to arrest defendant.

Next, defendant contends that the evidence presented at trial failed to establish that she was guilty of involuntary manslaughter. Defendant initially argues that the evidence established that she acted in self-defense against an aggressor who was committing a forcible felony (aggravated battery). In the alternative, defendant argues that the shooting was only an accident.

Whether a killing is justified under the law of self-defense is a question of fact to be determined by the trier of fact. (*People v. Felella* (1989), 131 Ill. 2d 525, 546 N.E.2d 492.) That determination will not be disturbed on appeal unless the evidence is so unreasonable, improbable or unsatisfactory as to leave a reasonable doubt of defendant's guilt. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.

The use of force in defense of the person is justified where (1) force had been threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm is imminent; (4) the force threatened was unlawful; (5) defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force used was necessary; and (6) that the beliefs were reasonable. (*People v. Balfour* (1986), 148 Ill. App. 3d 215, 221, 498 N.E.2d 547; *People v. Kyles* (1980), 91 Ill. App. 3d 1019, 415 N.E.2d 499.) Once defendant has presented some evidence as to each of these elements, the State has the burden of disproving the defense beyond a reasonable doubt. (*People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275.) If the State negates any one of the self-defense elements beyond a reasonable doubt, it has met its burden of proof. *People v. Zolidis* (1983), 115 Ill. App. 3d 669, 450 N.E.2d 1290.

■ In the present case, there is no evidence in the record to support self-defense. Defendant became the aggressor when she approached Barker, grabbed onto her hair, and placed her handgun at the back of Barker's head. Although defendant claimed that she saw a shiny object on the floor of the passenger side of the car, she admitted that she did not see Barker with a weapon. Therefore, defendant cannot claim that she was in imminent fear of death or great bodily harm.

If the defendant is the aggressor, defendant's use of deadly force is justified only if:

"(1) Such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

(2) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate[d] the use of force ***." Ill. Rev. Stat. 1985, ch. 38, pars. 7—4(c)(1), (c)(2).

In the present case, the record shows that defendant never attempted to escape the danger, if such danger existed. Defendant never withdrew from the struggle or terminated her use of force. The record thus reveals no evidence which tends to show that force was threatened against the defendant.

■ Further, the record indicates that the shooting constituted recklessness rather than a mere accident. Section 9—3 of the Criminal Code of 1961 provides:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.)

The Criminal Code defines recklessness as follows:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1985, ch. 38, par. 4—6.)

An accident is not to be equated with recklessness, and an accidental discharge of a gun will not support a conviction for involuntary manslaughter. (*People v. Franklin* (1989), 189 Ill. App. 3d 425, 545 N.E.2d 346.) The determination of whether a killing has resulted from an accident or reckless conduct, however, is a question for the trier of fact. (*People v. Schwartz* (1978), 64 Ill. App. 3d 989, 993, 382 N.E.2d 59.) That determination will not be disturbed unless it is palpably contrary to the weight of the evidence. *Franklin*, 189 Ill. App. 3d at 429.

This court has held that pointing a loaded gun at another constitutes recklessness because it is a gross deviation from the standard of care which a reasonable person would exercise. (*Schwartz*, 64 Ill. App. 3d at 994.) Further, defendant's contention that the firing of the weapon was accidental because she did not fire it voluntarily has been previously rejected by this court. (*People v. Andersch* (1982), 107 Ill. App. 3d 810, 818, 438 N.E.2d 482.) It is clear that defendant's acts of taking a loaded gun out to Barker's car to confront her, then grabbing Barker's hair and placing the gun at the back of Barker's head during the struggle, were reckless conduct. As such, defendant was proved guilty of involuntary manslaughter beyond a reasonable doubt.

Defendant further contends that she was denied a fair trial by the trial court's refusal to answer questions submitted to the trial judge by the deliberating jury. During deliberations, the jury sent a note to the court which stated:

"That the defendant performed the acts which caused the death of Cynthia Barker.

In regard to the above statement: What is the definition of the word 'acts'?

Does it mean 'pulled the trigger which discharged the gun that killed Cynthia.'

Does it also mean a sequence of events which resulted in the accidental discharge of the gun which killed Cynthia.

Does it refer to the 'acts' of murder with which she is charged?''

Ten minutes later, the jury sent the judge a second note which stated: "In regards to the sentence 'A person is justified in the use of force,' Does the word force mean 'shooting' or could it apply to a struggle." In response, the trial judge informed the jury that it received the instructions, that the words have common, everyday meanings, and that it was to continue to deliberate.

When the jury raises an explicit question on a point of law arising from facts over which there is doubt or confusion, the court should attempt to clarify the issue in the minds of the jury members. (*People v. Sanders* (1984), 127 Ill. App. 3d 471, 469 N.E.2d 287.) However, the trial court should not answer a question from the jury which calls for the court to make a conclusion based on its evaluation of the evidence. *People v. Doe* (1988), 175 Ill. App. 3d 371, 376, 529 N.E.2d 980.

■ In the present case, the record shows that the questions submitted by the jury indicated confusion as to what the evidence revealed. Under the circumstances, the trial court properly refused to assist the jury in evaluating the evidence. As such, defendant was not denied a fair trial.

Finally, defendant contends that the trial judge improperly considered Barker's death as an aggravating factor in refusing to sentence defendant to a term of probation instead of imprisonment. As evidence of her contention, defendant points to the trial judge's statement, "probational or conditional discharge would depreciate [*sic*] the seriousness of the offender's conduct and would be inconsistent with the ends of justice."

■ Defendant's contention is without merit. Section 5—6—1(a)(2) of the Unified Code of Corrections specifically provides that a trial court may impose a sentence of probation or conditional discharge "unless *** the court is of the opinion that *** probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice." Ill. Rev. Stat. 1985, ch. 38, par. 1005—6—1(a)(2).

It is well established that the imposition of a sentence is a matter of judicial discretion and that, absent an abuse of that discretion, the sentence as determined by the trial court should stand. (*People v.*

*Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884.) A reviewing court will hesitate to alter a sentence, especially where the sentence falls within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641, 649.

The record in this case indicates that defendant's sentence of three years' imprisonment is well within the statutory guidelines for involuntary manslaughter. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(6) (involuntary manslaughter is punishable with a term of not less than two years and not more than five years).) As the trial judge complied with the appropriate statutes in sentencing defendant, we find no error in defendant's sentence.

For the reasons stated, we affirm the judgment of the trial court.

Affirmed.

BUCKLEY and O'CONNOR, JJ., concur.