# Illinois Official Reports

## Appellate Court

---

**People v. Olivieri, 2016 IL App (1st) 152137**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL OLIVIERI, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-2137 |
| Filed | August 2, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-7206; the Hon. Timothy J. Chambers, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | William M. Traynor, of Northbrook, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Brenda K. Gibbs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Neville concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Michael Olivieri was convicted of reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2012)) and sentenced to 24 months' probation. On appeal, Olivieri challenges the sufficiency of the evidence to sustain his conviction. We reverse the conviction on the basis of insufficient evidence to support Olivieri's guilt, beyond a reasonable doubt, of reckless discharge of a firearm.

¶ 2                                                   Background

¶ 3     Olivieri was arrested and charged with discharging a gun in a reckless manner, which endangered the bodily safety of the woman who resided in the apartment next door to Olivieri's apartment.

¶ 4     At the bench trial, the neighbor, Hilary Burich, testified that she shared a kitchen wall with Olivieri. Burich was sleeping when she woke up startled by a loud noise at 1 a.m. on April 9, 2014. She was not sure what the noise was and did not think anything of it. She eventually went back to sleep. At 7 a.m., when Burich went into her kitchen, she noticed shattered tile on the ground and found a bullet, which she did not realize was a bullet at the time, in the middle of her kitchen floor. There was a hole right above her sink. She figured a pipe had burst or something had flown through her wall, but was not sure. She also found a note from Olivieri under her door asking her to call. The date on the note was April 9.

¶ 5     Burich called Olivieri and left him a message. When he returned her call, Burich told him what she saw and wanted to make sure he was okay. He then began to speak, but she could not understand him. He sounded confused, and she had no idea what he was saying. She told him to let her know if he knew anything else, hung up, and wrote him an e-mail.

¶ 6     In her e-mail, Burich informed Olivieri that there were some major issues with her kitchen sink and their common wall. She attached photographs of the damage to her wall. She wrote that it looked as if something "completely shot through." She mentioned that she had heard a really loud noise in the night and hoped it was the building's issue. She asked Olivieri if he had any damage to his side.

¶ 7     Olivieri sent Burich an e-mail on April 10, explaining that he recently received his Firearm Owner's Identification (FOID) card and concealed-carry permit. He further stated:

> "The bad news was that the noise that you heard was me accidentally discharging a pistol through sheer lack of not concentrating and it obviously created a hole in my wall and instant panic in me. I looked in your peephole and saw it was dark with no figures moving. I did the same in looking over your balcony. I did not know if it went under the side of your wall or was stopped by plumbing. Obviously looking at your pictures it did go through.
>
> It was pure negligence and lack of concentration on my part and you can rest assured that police took away the two cards and privileges and pistol. So the next point is please submit any costs to me that will be incurred for redesign and repair of your place. I am terribly embarrassed and, again, apologize sincerely especially after having training for safe use of a pistol for a year.
>
> I didn't sleep a wink last night thinking maybe I should have knocked on your door, but it was late and thought you were likely sleeping or traveling."

¶ 8    Before Burich received Olivieri's e-mail, the building management came to her apartment, told her the metal piece on her floor was a bullet and not from a pipe, and called the police.

¶ 9    Chicago police officer Cazares testified that at 9 a.m. on April 9, he and his partner responded to a call. He spoke with Burich, and she pointed out a bullet hole in her wall above the kitchen sink. He saw the bullet on the kitchen floor. Burich also showed him the note left by Olivieri under her door.

¶ 10    The officers then went to Olivieri's apartment. Olivieri told them that he accidentally shot his gun and a bullet went through his wall into Burich's wall. Olivieri showed the officers where the bullet went through the wall above his kitchen counter. The officers inventoried the gun, as well as eight additional unloaded weapons. Officer Cazares testified that Olivieri's apartment was unkempt, he seemed disheveled, and he was not making much sense. Officer Cazares took Olivieri into protective custody because he believed Olivieri needed a psychiatric evaluation. Olivieri was transported to the hospital. Officer Cazares had no further interaction with Olivieri.

¶ 11    Edward Oziminski testified that he was an Illinois concealed-carry instructor. Oziminski taught a total of 16 hours of concealed-carry classes to Olivieri on January 25 and February 2, 2014. Oziminski explained that the State required 16 hours of training. During the classes, he taught basic handgun safety and handling. Oziminski testified that he taught and repeated a number of times the basic safety rules.

¶ 12    Oziminski testified that if a firearm was lying on his kitchen counter with the hammer back, he would pick it up, keep it pointed in a safe direction, decock the firearm properly, and open the cylinder to see if it was loaded. He always assumes a firearm to be loaded and taught that in his classes. He instructed Olivieri on how to safely decock a revolver.

¶ 13    Oziminski further testified that pointing a gun at the wall in a condominium was not safe if you did not know what was on the other side of the wall.

¶ 14    The parties stipulated that Chicago police sergeant Kenneth Krock was a firearms expert. Krock testified that he examined the firearm, which was fully functioning and shown to him in court. In the single action mode, two pounds of pressure would probably be required to pull the gun's trigger. In double action mode, it would require seven pounds of pressure. There was gunshot residue in the gun indicating it had been fired.

¶ 15    Detective Thomas Karpinski testified that he interviewed Olivieri at his apartment a day or two after the incident. Olivieri was coherent and understandable. Olivieri told Detective Karpinski that, earlier on the evening of the shooting, he had gone for a walk in some dark areas with his loaded revolver in his pocket "cocked for single action." When he returned home, he placed the gun on his kitchen counter. Sometime later Olivieri picked up the gun and told Karpinski he felt "as if he was having a nervous tick like squeezing a tennis ball and then it went off." Detective Karpinski terminated the interview, advised Olivieri of his *Miranda* rights, and arrested him.

¶ 16    At the police station, Olivieri told Karpinski he would like to clarify his earlier statement. Olivieri told the detective that he had believed that he had placed "dummy rounds" in the gun when he left it cocked on the kitchen counter. He reiterated that he squeezed the trigger as if he was having a nervous tick. Detective Karpinski did not recall if Olivieri stated that the gun fired by accident.

¶ 17    The parties stipulated that James Joseph Miller was a qualified expert in the use of handguns and issues concerning firearms and firearms training. Miller testified for the defense. Miller stated that it was possible to place a gun from single action mode to double action mode and vice versa. According to Miller, some type of excitement, jarring, or mental condition can cause the trigger finger to actually squeeze the trigger and fire off a round, without the control of the individual. This is called a sympathetic nervous system reaction (SNSR). Law enforcement had discovered the condition and changed their training methods because of it.

¶ 18    Miller reviewed the police reports and "absolutely believe[d] this was an accidental discharge of a firearm" and not a reckless act. Miller believed that what occurred would not constitute a gross deviation from the standard of care that a reasonable person would exercise.

¶ 19    Olivieri testified that he was a family medicine doctor but no longer practiced. He developed some hobbies, including shooting, and, over the past five years, had purchased seven weapons. He went to the shooting range monthly. He never kept the guns loaded in his apartment and placed the ammunition in a hole in his mattress box spring. He was conscious of making it hard to find the ammunition because he had nephews and nieces who visited. Olivieri had a FOID card and a concealed-carry permit he received after taking a concealed-carry weapon class, which he passed. By April 9, he had had his concealed-carry permit for two weeks.

¶ 20    At 11:30 p.m. on April 8, Olivieri brought out a pistol and loaded it with live ammunition. He had never loaded live ammunition into a pistol while in his apartment. He then put the pistol, which was in double action mode, in his coat pocket and went for a walk. He returned home, placed the pistol on his kitchen counter, and went to the bathroom. When he returned to the kitchen, he planned to unload the pistol and put dummy rounds into it. Olivieri stated that what happened next was "kind of a blur." While he was "taking it apart," he did not know if he pulled the single action mode to look at the ammunition or the chamber, but mistakenly placed his finger on the trigger and, with what felt like a "twitch," involuntarily fired the pistol. He did not consciously decide to shoot nor intend to fire the weapon into his kitchen counter. It made the most horrific sound he had ever heard and was an accident. He had intended to unload his weapon and place dummy rounds in it because he did not keep loaded weapons in his apartment.

¶ 21    When he came back to the kitchen counter to put dummy rounds in the pistol, he "finagl[ed] with [the pistol], looking, you know, around the area in there and all that and pulled it partially to first, first action. The finger grasped it," and it felt "instinctive" and "not rational." Olivieri did not recall telling police that he placed dummy rounds in the pistol earlier and that, when he pulled the trigger, he thought there were dummy rounds in it.

¶ 22    The shooting occurred eight weeks after Olivieri finished his concealed-carry classes and the training he received from Oziminski was still fresh in his mind, including the basic safety rules. When asked if he put any of those rules into practice when he picked up his pistol, he responded "well, my mind set was I was not going to be firing, so, obviously, it was—I was alone in the room."

¶ 23    Olivieri acknowledged that there was no safe direction to point the pistol in his apartment and grasping the grip of the pistol did not require him to put his finger on the trigger. When he picked up the pistol, it was not in single action mode, the hammer was not back. Olivieri stated that he pulled the hammer back to unload it and look at the cylinder, which was a mistake. Olivieri admitted that he could not open the cylinder to unload the pistol if he pulled the

hammer back. He also admitted that he could pick up the pistol without placing his finger on the trigger and pulling the hammer back to see whether or not it was fully loaded.

¶ 24   At the close of evidence, the court found Olivieri guilty of reckless discharge of a firearm. In doing so, the court noted that there was testimony that the pistol could be loaded and unloaded without the hand on the trigger and on the hammer. Simply placing one's hand on the handle can open the cylinder. The court stated that Olivieri had a loaded firearm, picked it up, pulled the trigger, and discharged it through the wall and into a neighbor's apartment. The court concluded that Olivieri acted in a "clear reckless fashion." Olivieri was sentenced to 24 months' probation.

¶ 25                                    Analysis

¶ 26   Olivieri contends the evidence was insufficient to establish beyond a reasonable doubt that he was guilty of reckless discharge of a firearm. He maintains that this was an unintentional and accidental discharge of a firearm while he attempted to unload it, and that he did not endanger the bodily safety of Burich.

¶ 27   When a defendant challenges the sufficiency of the evidence to sustain a conviction, the proper standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004). This standard recognizes the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992). A criminal conviction will not be reversed unless the evidence is so unsatisfactory as to raise a reasonable doubt of guilt. *Id.*

¶ 28   We find that there was insufficient evidence to prove beyond a reasonable doubt that Olivieri was guilty of reckless discharge of a firearm. To sustain Olivieri's conviction for reckless discharge of a firearm, the State must prove Olivieri discharged a firearm in a reckless manner that endangered the bodily safety of an individual. 720 ILCS 5/24-1.5(a) (West 2012).

> "A person is reckless or acts recklessly when [he] consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2012).

An accident is not to be equated with recklessness. *People v. Franklin*, 189 Ill. App. 3d 425, 429 (1989).

¶ 29   The evidence does not support the court's finding of recklessness in discharging the pistol. Olivieri had been issued a FOID card and recently received his concealed-carry permit. The record shows that Olivieri placed live rounds in the pistol when he went for his walk. On returning, he placed his pistol on the kitchen counter, and went to the bathroom. Afterwards, he pulled the hammer back to unload the pistol and look at the cylinder, which he acknowledged was a mistake because he could not open the cylinder to unload the pistol if he pulled the hammer back. Then, by an involuntary movement, which he described as a "twitch" made without conscious consideration, his finger squeezed the trigger and fired off a round. Olivieri's actions met Miller's definition of SNSR, a condition where the trigger finger

squeezes the trigger and fires a round without control of the shooter but rather due to some type of excitement, jarring, or mental condition.

¶ 30    It was established at trial that Olivieri accidentally pulled the trigger while attempting to unload the pistol to make it safe. We find the evidence does not support the trial court's finding that Olivieri acted recklessly beyond a reasonable doubt.

¶ 31    In so holding, we find the State's cases highly distinguishable. In support of its position that Olivieri acted recklessly, the State cites *People v. Andersch*, 107 Ill. App. 3d 810, 811-16 (1982), and *Franklin*, 189 Ill. App. 3d at 430. In *Andersch*, 107 Ill. App. 3d at 812, the defendant, holding a rifle, approached some men in his apartment building who were being loud and told them if they were not quiet, he would shoot them. The defendant then fired two fast shots, fatally shooting two of the men. *Id.* The defendant testified that he thought the rifle was unloaded and had not fired the collector's item for more than six years before the shooting. *Id.* at 815. On appeal, he argued that the shooting was accidental and an unconscious act. *Id.* at 817. This court found that the defendant acted recklessly in not checking the condition of the rifle before firing it and that the risk or result was the natural product of his acts. *Id.* at 818. Unlike in *Andersch*, Olivieri did not point his pistol at a group of people. Rather, he was attempting to unload it when it went off. The discharge was not the natural product of his act.

¶ 32    In *Franklin*, 189 Ill. App. 3d at 427, the defendant had been drinking, got into an argument with the victim, and shot him. When police arrived, the defendant admitted he shot the victim. *Id.* He specifically told the officers that the victim came at him, so he picked up a gun and, as he stood up, he stumbled backwards, causing the gun to discharge, striking and killing the victim. *Id.* The defendant changed his story when he spoke to the assistant State's Attorney, indicating that he heard someone shuffling in the house, retrieved his pistol, and the pistol accidentally discharged, striking a person in the next room. *Id.* at 428. On appeal, the defendant argued that the shooting was an accident because the alcohol in his system caused him to stumble, which in turn caused the gun to discharge, and, therefore, the necessary element of recklessness was absent. *Id.* at 429. This court found that handling a gun while intoxicated was reckless conduct, and that the defendant's argument confused reckless conduct with the risks or results associated with such conduct. *Id.* at 430. The court stated that stumbling while handling the gun and the subsequent discharge were risks the defendant took. *Id.* Olivieri was not drunk, was aware of the danger inherent in a loaded gun, and, therefore, was attempting to unload the gun. Handling a loaded gun in an attempt to unload it does not carry with it the same risk as in *Franklin* that the gun will discharge.

¶ 33    We also find the following cases cited by the State distinguishable: *People v. Lemke*, 349 Ill. App. 3d 391 (2004), *People v. Testin*, 260 Ill. App. 3d 224 (1994), *People v. Thomas*, 8 Ill. App. 3d 690 (1972), and *People v. Watkins*, 361 Ill. App. 3d 498 (2005). In *Lemke*, 349 Ill. App. 3d at 396, the reviewing court noted that pointing a gun at someone is reckless. In *Testin*, 260 Ill. App. 3d at 229-30, the defendant's conduct of speeding and weaving between driving lanes was reckless homicide. In *Thomas*, 8 Ill. App. 3d at 693, drawing a loaded gun in a crowded tavern was a reckless act. Finally, in *Watkins*, 361 Ill. App. 3d at 502, the defendant's conduct of firing several gunshots into the air in a residential neighborhood was reckless conduct.

¶ 34    Unlike in the State's cited cases, which involved rash and reckless conduct, Olivieri did not point his gun at someone or draw a loaded gun in a crowded area or fire his gun into the air. Instead, Olivieri was attempting to unload the gun when it fired. The element of recklessness

was not proven beyond a reasonable doubt.

¶ 35        Reversed.