# Illinois Official Reports

## Appellate Court

---

### *People v. Cunningham*, 2019 IL App (1st) 160709

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAEKWON CUNNINGHAM, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-0709 |
| Filed | March 29, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-2215; the Hon. Kevin M. Sheehan, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, mittimus corrected. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Todd T. McHenry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Doulas P. Harvath, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Presiding Justice Rochford and Justice Hoffman concurred in the judgment and opinion. |

**OPINION**

¶ 1    The State charged defendant, Daekwon Cunningham, with unlawful use of a weapon (UUW) and reckless discharge of a firearm. Because defendant allegedly possessed the firearm while in public housing, the State sought to have defendant sentenced as a Class 3 felon. Following a bench trial, the circuit court of Cook County convicted defendant of both counts and sentenced him to three years' imprisonment for Class 3-felony UUW and a concurrent two-year term of imprisonment for reckless discharge of a firearm. Defendant appeals his convictions, arguing the UUW statute is unconstitutional on its face and, therefore, his conviction for UUW is void and the State failed to prove every element of reckless discharge of a firearm beyond a reasonable doubt and his conviction must be reversed.

¶ 2    For the following reasons, we affirm in part and reverse in part.[1]

¶ 3                                    I. BACKGROUND

¶ 4    The State charged defendant with unlawful use of a weapon and reckless discharge of a firearm based on defendant having shot himself in the leg. The charging instrument stated the State sought to have defendant sentenced as a Class 3 felon because the incident took place in an apartment owned by the Chicago Housing Authority and used as public housing. Count I of the information against defendant reads, in pertinent part, as follows:

> "Daekwon Cunningham committed the offense of UNLAWFUL USE OF A WEAPON in that HE, KNOWINGLY CARRIED OR POSSESSED CONCEALED ON OR ABOUT HIS PERSON ANY FIREARM, AT A TIME WHEN HE WAS NOT ON HIS OWN LAND OR IN HIS OWN ABODE OR FIXED PLACE OF BUSINESS, IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 24-1(a)(4) OF THE ILLINOIS COMPILED STATUTES *** AND THE STATE SHALL SEEK TO SENTENCE HIM AS A CLASS 3 OFFENDER PURSUANT TO SECTION 24-1(c)(1.5) IN THAT THE VIOLATION OCCURRED IN RESIDENTIAL PROPERTY OWNED, OPERATED OR MANAGED BY A PUBLIC HOUSING AGENCY OR LEASED BY A PUBLIC HOUSING AGENCY AS PART OF A SCATTERED SITE OR MIXED-INCOME DEVELOPMENT."

¶ 5    The State called three witnesses at defendant's bench trial: Chicago Police Department Sergeant Joseph Nemcovic, Chicago Police Department Officer Brendan Gill, and Kenya Gayton, whose apartment the incident occurred in.

¶ 6    Gayton testified she lived in her apartment with her boyfriend and daughter. When Gayton arrived home on the day defendant was shot, defendant, Gayton's boyfriend Jerry, and two others were in the apartment. Gayton saw them running from the area of two back bedrooms. Defendant exclaimed, "I'm shot, I'm shot." Gayton initially believed the exclamation was a prank, so she went to her bedroom. When she returned to the living room, she saw defendant lying on the floor bleeding from his right leg. Jerry and the two others were also present. Jerry was holding a gun. Gayton took the gun from Jerry and put it in a different apartment in the building. Gayton returned to her apartment, and police arrived soon thereafter. Gayton was

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

evasive at first but eventually retrieved the gun and gave it to police. Gayton testified that, at the time defendant was shot, he had been staying in her apartment for about one week, but defendant did not pay any rent or bills.

¶ 7 Sergeant Nemcovic testified he responded to Gayton's apartment for a report of a gunshot victim. Sergeant Nemcovic testified defendant stated he was shot outside while walking up the street. Based on his observations of the location of the gunshot wound and defendant's clothing, Sergeant Nemcovic did not believe that defendant was shot outside. An ambulance arrived to transport defendant to the hospital. While en route, Sergeant Nemcovic learned another officer had recovered a shell casing from the back bedroom of Gayton's apartment. Officer Gill testified he recovered the shell casing from the floor of the far rear bedroom in Gayton's apartment. Sergeant Nemcovic testified that once at the hospital defendant apologized to Sergeant Nemcovic for not telling him the truth earlier and stated he (defendant) had shot himself.

¶ 8 At the close of the State's case, defendant moved for a directed verdict. Defendant argued that, because he had stayed in the apartment for a week, he was in his own abode for purposes of the UUW statute. Defendant also argued the State failed to elicit any evidence he acted recklessly, and the evidence was only that he shot himself accidentally. The trial court denied defendant's motion for a directed verdict. Defendant did not testify and did not present any evidence. The court found defendant guilty of UUW and reckless discharge of a firearm and sentenced him to three years' imprisonment for UUW and a concurrent term of two years' imprisonment for reckless discharge.

¶ 9 This appeal followed.

¶ 10 II. ANALYSIS

¶ 11 Defendant challenges the constitutionality of the UUW statute and the sufficiency of the evidence to prove reckless discharge of a firearm. "The question of whether a statute is unconstitutional is a question of law, which this court reviews *de novo*." *People v. Chairez*, 2018 IL 121417, ¶ 15.

"When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements beyond a reasonable doubt. [Citation.] [I]t is not the function of this court to retry the defendant. [Citation.] All reasonable inferences from the evidence must be drawn in favor of the prosecution. [I]n weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. [Citation.] We will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. [Citation.]" (Internal quotation marks omitted.) *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 12                                A. Constitutionality of UUW Statute

¶ 13      The trial court convicted defendant for violating section 24-1(a)(4), (c)(1.5) (in public housing) of the Criminal Code of 2012 (Criminal Code) which reads, in pertinent part, as follows:

> "(a) A person commits the offense of unlawful use of weapons when he knowingly:
>
> * * *
>
> (4) Carries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm, except that this subsection (a) (4) does not apply to or affect transportation of weapons that meet one of the following conditions:
>
> > (i) are broken down in a non-functioning state; or
> >
> > (ii) are not immediately accessible; or
> >
> > (iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card; ***
>
> * * *
>
> (c) Violations in specific places.
> ***
>
> (1.5) A person who violates subsection 24-1(a)(4) *** in residential property owned, operated, or managed by a public housing agency or leased by a public housing agency as part of a scattered site or mixed-income development *** or on any public way within 1,000 feet of the real property comprising any *** residential property owned, operated, or managed by a public housing agency or leased by a public housing agency as part of a scattered site or mixed-income development commits a Class 3 felony." 720 ILCS 5/24-1(a)(4), (c)(1.5) (West 2014).

The statutory language of section 24-1(a)(4) amounts to a comprehensive ban on the possession of an operable firearm for self-defense outside of the home, which the United States Court of Appeals for the Seventh Circuit found unconstitutional in *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). This court followed suit and found "nearly identical" language in section 24-1(a)(4) facially unconstitutional in *People v. Gamez*, 2017 IL App (1st) 151630, ¶¶ 11, 14. Defendant acknowledged that our supreme court recently held that the "specific places" provision of the UUW statute (section 24-1(c)(1.5)) creates separate offenses from the unconstitutional blanket prohibition on the possession of firearms outside the home for self-defense stated in section 24-1(a)(4). *Chairez*, 2018 IL 121417, ¶ 18 ("section 24-1(c)(1.5) is separate and apart from the sentencing provision of the UUW statute, section 24-1(b). Thus, we presume that the General Assembly intended that, if proven at trial, the specific locations enumerated in section 24-1(c)(1.5) are to be separate offenses that carry their own enhanced sentences different from the prescribed sentences in section 24-1(b)."). Consistent with its holding that each "specific place" constitutes a separate offense, our supreme court vacated the trial court's judgment finding the entirety of section 24-1(c)(1.5) unconstitutional because the defendant in that case "was convicted of violating section 24-1(a)(4), (c)(1.5) by being within

- 4 -

1000 feet of a public park, [therefore] the various other 'specific places' offenses set forth in section 24-1(c)(1.5) were not before the circuit court, and *** defendant lacked standing to challenge the constitutionality of the offenses of which he was not charged." *Id.* ¶ 13. Our supreme court correspondingly limited its discussion "to the firearm restriction *** to which [the] defendant pled guilty—possession of a firearm within 1000 feet of a public park." *Id.* The court expressly made no findings with respect to any other offenses within the UUW statute. *Id.*

¶ 14        Similarly, in this case, defendant has standing to challenge only the firearm restriction in section 24-1(a)(4), (c)(1.5) (in public housing) of which he was convicted. Defendant argues *Chairez* demonstrates that section 24-1(a)(4), (c)(1.5) (in public housing) is facially unconstitutional because (1) *Chairez* establishes that, to survive a constitutional challenge, the State "must make a strong showing of a substantial justification for subsection (c)(1.5), as well as a close fit between a law that bans firearms in public housing residences and its end: the safety of those residents and invitees," and (2) the State failed to make that showing in this case. The *Chairez* court stated that answering the question of whether a portion of the UUW statute is constitutional "involves a two-part approach." *Id.* ¶ 21.

> "First, we conduct a textual and historical analysis of the second amendment 'to determine whether the challenged law imposes a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of ratification.' [Citation.] If the conduct falls outside of the scope of the second amendment, then the regulated activity 'is categorically unprotected,' and the law is not subject to further second amendment review. [Citation.] But if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected, then we apply the appropriate level of heightened means-ends scrutiny and consider the strength of the government's justification for restricting or regulating the exercise of second amendment rights. [Citation.]" *Id.*

¶ 15        Turning to step one, the "scope of the second amendment's protection" is "not unlimited." (Internal quotation marks omitted.) *Id.* ¶¶ 21, 24. Some "presumptively lawful regulatory measures" (*District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008)) include "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" (*id.* at 626-27). Our supreme court "has held that the second amendment protects an individual's right to carry a ready-to-use gun outside the home, subject to certain regulations." *Chairez*, 2018 IL 121417, ¶ 26 (citing *People v. Mosley*, 2015 IL 115872, ¶ 25). The question in determining whether the regulation is lawful is whether the law "*impermissibly* encroaches on conduct at the core of the second amendment." (Emphasis added.) *Id.* Regarding what encroachments are impermissible, the United States Supreme Court has not offered additional guidance on other specific places where the right to bear arms is not afforded absolute protection by the second amendment or what are permissible regulations on the amendment's reach. *Id.* ¶ 29 ("Beyond *Heller*'s two examples of 'sensitive places,' *i.e.*, 'schools and government buildings,' the Supreme Court has not yet provided a list of additional sensitive places that fall outside the second amendment protection or given any guidance on the breadth of its statement."). However, such guidance as to the specific place at issue in this case is not necessary because our supreme court takes the "approach taken by other courts that assume

- 5 -

some level of scrutiny must apply to *Heller*'s 'presumptively lawful' regulations." *Id.* ¶ 30. That is, Illinois courts will "apply the appropriate level of heightened means-ends scrutiny and consider the strength of the government's justification for restricting or regulating the exercise of second amendment rights" (*id.* ¶ 21) under the second step, even where a "presumptively lawful regulation" is involved. See *id.* ¶ 30 (and cases cited therein). Accordingly, the State's argument in this case, that "the inquiry stops at the first stage because carrying weapons in sensitive locations is not protected by the Second Amendment," fails.

¶ 16    Turning to the second step of the inquiry into the constitutionality of a restriction on the right to bear arms protected by the second amendment, this court applies "heightened means-end" scrutiny to second amendment cases. *Id.* ¶ 35 (citing *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)).

> "Under this approach, the second step of the inquiry requires the court to examine the strength of the government's justifications for restricting certain firearm activity by evaluating the restriction the government has chosen to enact and the public-benefits ends it seeks to achieve. [Citations.] *** [A] severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. [Citation.] However, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. [Citation.] Thus, the heightened means-end inquiry is a sliding scale that is neither fixed nor static. [Citations.]" (Internal quotation marks omitted.) *Id.*

Thus, " 'substantial *** curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public might benefit on balance from such a curtailment.' " (Emphasis omitted.) *Id.* ¶ 43 (quoting *Moore*, 702 F.3d at 940). "[C]onversely, when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need." (Internal quotation marks omitted.) *Id.* (citing *Moore*, 702 F.3d at 940). The inquiry for this court becomes determining whether the restriction at issue is "a severe burden on the core Second Amendment right of armed self-defense" or a law that merely regulates rather than restricts the second amendment right or one which places "modest burdens on the right." (Internal quotation marks omitted.) See *id.* ¶ 35. "To answer this question, our first task is to determine the breadth of the law and the severity of its burden on the second amendment." *Id.* ¶ 46. "The closer in proximity the restricted activity is to the core of the second amendment right and the more people affected by the restriction, the more rigorous the means-end review." *Id.* ¶ 45.

¶ 17    In this case, the State argues "the regulated conduct falls outside the core protections of the Second Amendment" because the "statute is actually part of the well-established class of regulations that limit carriage of firearms in sensitive locations." Defendant argues section 24-1(c)(1.5) (in public housing) "affects a large number of residents that do not have alternative affordable housing options" and "goes even more directly to the core of the Second Amendment than the restrictive zones reviewed in *Chairez*" because "[t]he right to bear arms in the home for self-defense is clearly at the very core of the Second Amendment."

¶ 18    Initially, we find that defendant's argument that the breadth of the statute at issue in this case demands that the State demonstrate "an extremely strong public-interest justification and

a close fit between the government's means and its end" because it impacts tens of thousands of public housing residents is misplaced. Defendant's violation of the prohibition in section 24-1(c)(1.5) at issue in this case is premised on a violation of section 24(a)(4). See 720 ILCS 5/24-1(c)(1.5) (West 2014) ("A person who violates subsection 24-1(a)(4) ***."). Section 24-1(a)(4) provides an exception for persons in their "own abode [or] legal dwelling." 720 ILCS 5/24-1(a)(4) (West 2014). Therefore, the statute at issue in this case could not be applied to a resident of public housing. On the face of section 24-1(a)(4), (c)(1.5), residents of public housing are not prohibited from carrying or possessing a firearm "in residential property owned *** by a public housing agency." 720 ILCS 5/24-1(a)(4), (c)(1.5) (West 2014). We have no need to speculate whether a resident of public housing is prohibited from carrying or possessing a firearm "on any public way within 1,000 feet of the real property comprising *** residential property owned *** by a public housing agency" (720 ILCS 5/24-1(c)(1.5) (West 2014)), whether the exception would apply, or whether such a ban would effectively prohibit public housing residents from exercising their second amendment right to carry a firearm for self-defense (*Moore*, 702 F.3d at 942) in public and therefore be unconstitutional. Defendant was not convicted of violating the "within 1000 feet" provision of section 24-1(c)(1.5) and has no standing to challenge the constitutionality of that provision. *Chairez*, 2018 IL 121417, ¶ 13.

¶ 19 Residents of public housing, to whom the statute at issue does not apply, aside, the prohibition in this case is more akin to a ban on guns merely in particular places. It is a specific ban on the carriage of guns by nonresidents in public housing. "[A] person can preserve an undiminished right of self-defense by not entering those places ***." *Moore*, 702 F.3d at 940. And "since that's a lesser burden, the state doesn't need to prove so strong a need." *Id.* Recently, in *People v. Bell*, 2018 IL App (1st) 153373, this court addressed a ban on the carriage of guns in a particular place. In *Bell*, the particular place was a public park. *Id.* ¶ 3 (the State charged the "defendant with [unlawful use of a weapon] in a public park pursuant to section 24-1(a)(10), (c)(1.5) of the *** Code *** (720 ILCS 5/24-1(a)(10), (c)(1.5) (West 2014))"). On appeal, the defendant argued the statute under which he was convicted is facially unconstitutional "because it amounts to a flat ban on carrying ready-to-use guns outside the home." *Id.* ¶ 11. The State "argued that section 24-1(a)(10), (c)(1.5) of the UUW statute was not facially unconstitutional because there was a significant interest in keeping children safe, as evidenced by studies that had been done regarding school zones and school shootings." *Id.* ¶ 15. This court, pursuant to *Chairez*, rejected the defendant's arguments that the particular place provision in section 24-1(c)(1.5) of the UUW statute was merely a sentencing factor and the core substantive offense, found in that case in section 24-1(a)(10), was unconstitutional. *Id.* ¶¶ 13-14. The court then turned to the constitutionality of the separate offense stated in section 24-1(a)(10), (c)(1.5) (in a public park). *Id.* ¶¶ 14, 16.

¶ 20 The *Bell* court noted that it was required to undertake the same two-part approach taken in *Chairez*. *Id.* ¶ 17. The *Chairez* court required the State to establish a close fit between the 1000-foot firearm restriction around a public park at issue in that case and the actual public interest it served. *Id.* ¶ 26 (citing *Chairez*, 2018 IL 121417, ¶ 50). In *Chairez*, the State did not establish "the required means-end fit between the challenged law and its justifications," therefore the court held the law prohibiting possessing a firearm within 1000 feet of a public park facially unconstitutional. *Id.* ¶ 28 (citing *Chairez*, 2018 IL 121417, ¶ 56). The *Bell* court then turned to "whether the possession of a firearm in a public park provision of the UUW statute is facially unconstitutional by examining the strength of the government's justifications

for restricting certain firearm activity by evaluating the restriction the government has chosen to enact and the public-benefits ends it seeks to achieve." *Id.* ¶ 29. The *Bell* court began by reiterating,

> "as stated in both *Chairez* and *Moore*, that a blanket prohibition on carrying guns in public prevents a person from defending himself anywhere except inside his home, and such a substantial curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public might benefit on balance from such a curtailment. [Citations.] Conversely, when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state [does not] need to prove so strong a need." (Internal quotation marks omitted.) *Id.* (citing *Chairez*, 2018 IL 121417, ¶ 43; *Moore*, 702 F.3d at 940).

The court found "that public parks are areas where large numbers of people, including children, congregate for recreation, and that [s]uch circumstances justify reasonable measures to secure public safety." (Internal quotation marks omitted.) *Id.* (citing *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011)). The *Bell* court also distinguished *Chairez* on the ground that, "[w]hile the *Chairez* court ultimately found that the 'most troubling aspect' of the 1000-feet from a public park provision was 'the lack of any notification where the 1000-foot restriction zone starts and where it would end,' no such issues exist in the portion of the statute at issue here." *Id.* ¶ 30 (quoting *Chairez*, 2018 IL 121417, ¶ 55). The *Bell* court held

> "a person can certainly preserve an undiminished right of self-defense by simply not entering a public park. Accordingly, while the evidence that the State points to largely concerns public schools, we nevertheless find, as noted in *Chairez*, that the purpose of the UUW statute is to protect the police and public from dangerous weapons." (Internal quotation marks omitted.) *Id.* (citing *Chairez*, 2018 IL 121417, ¶ 62).

The court held the prohibition on guns in public parks "continues to accomplish this aim without 'effectively prohibit[ing] the possession of a firearm for self-defense within a vast majority of the acreage in the city of Chicago.' " *Id.* (quoting *Chairez*, 2018 IL 121417, ¶ 55). The court declined to find section 24-1(a)(10), (c)(1.5) unconstitutional. *Id.* ¶ 31 ("We reiterate that all statutes carry a strong presumption of constitutionality, and that we will find a statute constitutional if it can be reasonably done. [Citation.] We find that it can reasonably be done in this case ***.").

¶ 21   In this case, the State argues the provision at issue "is substantially related to the important government interest in preventing harm to families, children, seniors, persons with disabilities and other vulnerable populations who reside in public housing." The State argues that, like the public park in *Bell*, the law only prohibits firearms "in" a public housing building and, "[l]ike public parks, public housing buildings are areas where large numbers of people, including children, congregate, and for all the same reasons and the same rationale, the prohibition on possessing firearms in [Chicago Housing Authority (CHA)] buildings is a reasonable measure[ ] to secure public safety." (Internal quotation marks omitted.) The State also cites studies finding that residents of public housing suffer a higher rate of violent crimes involving guns and are exposed to a high level of gun violence, which negatively impacts communities and, therefore, public housing agencies, like the CHA, may constitutionally regulate weapons on CHA-owned properties in an effort to prevent crime. Defendant replies that "although the State argues that the government has a strong public interest in ensuring safety within public

- 8 -

housing units, it fails to present any meaningful argument as to the relationship between the outright ban set forth in subsection (c)(1.5) and its end." Defendant argues the State failed to make the "strong showing" required by *Chairez* because its "propositions are devoid of any useful statistics or empirically supported conclusions" and that "oversight is dispositive." Additionally, defendant cites scholarly works stating gun bans do not improve public safety or reduce gun violence in public housing.

¶ 22    In *Chairez*, in defense of the gun ban within 1000 feet of a public park, the State claimed that "a compelling interest in public safety is served by reducing firearm possession within 1000 feet of a public park." *Chairez*, 2018 IL 121417, ¶ 51. The State attempted to relate the reasoning behind gun-free school zones to public parks, stating that "because there is a substantial and distinctive interest in protecting those in parks due to a large number of children who frequent these places, prohibiting firearms near public parks is substantially related to the important government interest in protecting these children and others." *Id.* Our supreme court accepted "the general proposition that preventing crime and protecting children are important public concerns" but held the State could not "simply invoke these interests in a general manner and expect to satisfy its burden." *Id.* ¶ 52. The court found the State's propositions "devoid of any useful statistics or empirically supported conclusions." *Id.* ¶ 53. In *Chairez*, the State cited data on school shootings from 1993 to 1999 "purporting to show the pervasiveness of guns and violence in schools" but it failed to connect those statistics to the challenged restriction in any meaningful way. *Id.* It merely recited numbers and concluded that children need to be protected from gun violence. *Id.* The State also cited "data showing that, in Illinois between 1982 and 1991, there was an increase in the number of juvenile arrests for both weapons violations and for murder by use of a firearm." *Id.* Based on those statistics the State concluded that juvenile violence is inextricably linked to firearms. *Id.* Finally, the State provided a statistic "that during the 1992-93 school years, 158 firearms were confiscated on or near public school grounds in Chicago." (Internal quotation marks omitted.) *Id.* Our supreme court held that, based on the record, the State provided "no evidentiary support for its claims that prohibiting firearms within 1000 feet of a public park would reduce the risks it identifies." *Id.* ¶ 54. The court held:

> "Without specific data or other meaningful evidence, we see no direct correlation between the information the State provides and its assertion that a 1000-foot firearm ban around a public park protects children, as well as other vulnerable persons, from firearm violence. The State merely speculates that the proximity of firearms within 1000 feet threatens the health and safety of those in the public park. The lack of a valid explanation for how the law actually achieves its goal of protecting children and vulnerable populations from gun violence amounts to a failure by the State to justify the restriction on gun possession within 1000 feet of a public park." *Id.*

¶ 23    We reject defendant's argument the State failed to make the required showing to survive "heightened means-end scrutiny." In this regard, we are guided by this court's reminder in *Bell* that "all statutes carry a strong presumption of constitutionality, and *** we will find a statute constitutional if it can be reasonably done." *Bell*, 2018 IL App (1st) 153373, ¶ 31. We also find *Doe v. Wilmington Housing Authority*, 880 F. Supp. 2d 513 (D. Del. 2012), *rev'd in part on other grounds*, 568 F. App'x 128 (3d Cir. 2014), instructive. In *Doe*, a resident of a privately-owned housing facility managed by the Wilmington Housing Authority (WHA) and a resident of a public housing facility owned and operated by WHA challenged under the

second amendment, *inter alia*, a policy in their lease agreement that prohibited residents and guests from carrying a firearm in any common area of the property except when being transported to or from the resident's unit or used for self-defense (the Common Area Provision). *Id.* at 518-20. The *Doe* court applied intermediate scrutiny to the dispute.

> "To withstand intermediate scrutiny, there must be a reasonable, but not necessarily perfect, fit between the challenged regulation and a significant, substantial, or important government interest. See [*United States v.*] *Marzzarella*, 614 F.3d [85,] 98 [(3d Cir. 2010)]. The Third Circuit explained in *Marzzarella* that if a regulation is 'neither designed to nor has the effect of prohibiting the possession of any class of firearms, it is more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights.' *Id.* at 97. Just as the regulations on the time, place, and manner of First Amendment rights are evaluated by intermediate scrutiny, so too are analogous regulations on the exercise of Second Amendment rights. See *id.*" *Id.* at 533.

As it pertains to this appeal, the *Doe* court recognized that "the stated goal of the Common Area Provision is to promote and protect the safety of WHA residents, their guests, and WHA employees." *Id.* at 535. The court also found that

> "WHA, as a state agency, has an important and substantial interest in protecting the health, safety, and welfare of its residents, their guests, its employees, and the public at large while on WHA property. *See generally Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376, 117 S. Ct. 855, 137 L.Ed.2d 1 (1997) (discussing 'significant governmental interest in public safety'); 42 U.S.C. § 1437c-1(d)(14)(A) (mandating public housing entities to devise safety plans that 'shall provide, on a project-by-project or jurisdiction-wide basis, for measures to ensure the safety of public housing residents')." *Id.*

The *Doe* court concluded "there is a reasonable fit between the Common Area Provision and the WHA's interest in protecting the safety of residents, guests, and others who are present from time to time at housing facilities owned or operated by the WHA." *Id.* The court noted that:

> "Public housing authorities like the WHA are generally afforded wide latitude in their ability to regulate what occurs on their property and determine the best policy for protecting the health, safety, and welfare of their residents. *See generally Heller v. District of Columbia*, 698 F.Supp.2d 179, 191 (D.D.C. 2010) (stating intermediate scrutiny permits authorities to 'paint with a broader brush than strict scrutiny') (internal quotation marks omitted), *aff'd in part and rev'd in part by Heller II*, 670 F.3d at 1244. The Common Area Provision promotes these interests by limiting guns in the common areas, thereby limiting potential violence within those areas. Also relevant is the fact that a large proportion of the tenants and guests who are frequently present in the common areas are elderly or children, who may be particularly vulnerable.
>
> 'A state need not go beyond the demands of common sense to show that a statute promises directly to advance an identified governmental interest.' [Citation.] The Court concludes that, as a matter of common sense, there is a reasonable fit between the Common Area Provision and the promotion of safety in the common areas. Accordingly, again, intermediate scrutiny is satisfied." *Id.* at 535-36.

The *Doe* court acknowledged the plaintiffs' argument that the Common Area Provision limited "a tenant's Second Amendment right[ ] to only those occasions when tenants are transporting their weapons to and from their units, while denying tenants the same protection when they undertake any other activity within the common area." *Id.* at 536. The *Doe* court agreed that was the result of the provision but found it not an absurd result as argued nor that it "so ill serves the WHA's interest in safety as to render the provision unconstitutional." *Id.* The *Doe* court held:

> "The WHA is charged with ensuring the safety of all residents, guests, and employees on property owned or operated by the WHA. The WHA's determination that safety is best promoted by prohibiting possession of firearms in common areas—while a policy decision with which others may reasonably disagree—is not so unreasonable as to fail intermediate scrutiny.
>
> *** While the Common Area Provision may not be the least restrictive means of serving the WHA's interest in protecting the safety of the common areas, and the fit may not be 'perfect,' the provision does not burden Second Amendment rights (assuming they exist in this context) any more than is reasonably necessary to ensure that the asserted government end is met." *Id.* at 537.

¶ 25    The statutory provision at issue in this case does impose some burden on visitors' to public housing second amendment rights. However, this burden is not a categorical ban on the carrying of firearms in public and therefore a "more rigorous showing" under heightened intermediate scrutiny is not required. See *Chairez*, 2018 IL 121417, ¶¶ 39-40. Further, despite some burden on their second amendment rights, residents of Illinois may still "preserve an undiminished right of self-defense by not entering" public housing, and therefore, "the state doesn't need to prove so strong a need" for the law. *Moore*, 702 F.3d at 940. That a realistic concern for the safety of residents of public housing and their guests exists cannot reasonably be disputed. See *Doe*, 880 F. Supp. 2d at 535. There is more than a "rational"[2] fit between "protecting the safety of residents, guests, and others who are present from time to time at housing facilities" and limiting the number of guns on public housing properties, "thereby limiting potential violence" (*id.* at 535-36). The law and the State's justification for the provision at issue are "not so unreasonable as to fail intermediate scrutiny." *Id.* at 537; see also *Culp v. Madigan*, 840 F.3d 400, 403 (7th Cir. 2016). We "need not go beyond the demands of common sense to show that a statute promises directly to advance an identified governmental interest." (Internal quotation marks omitted.) *Doe*, 880 F. Supp. at 536. The State's aim is to protect vulnerable populations in public housing facilities, and it has done so with a modest and easily avoidable burden on its citizens' second amendment rights. We hold the statutory provision at issue in this case survives the heightened intermediate scrutiny that is applicable in this instance and, thus, defendant's facial challenge to the statute fails.

¶ 26                    B. Sufficiency of the Evidence of Reckless Discharge

¶ 27    Next, defendant argues the State failed to adduce sufficient evidence to prove beyond a reasonable doubt the "reckless" element of reckless discharge of a firearm. "A person commits

---

[2]"In all cases the government bears the burden of justifying its law under a heightened standard of scrutiny; rational-basis review does not apply." *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017).

reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2014). The Criminal Code defines recklessness as follows:

> "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the term 'wantonly', unless the statute clearly requires another meaning." 720 ILCS 5/4-6 (West 2014).

This court has held "our legislature intended the term 'an individual' to mean someone other than the 'person' who is charged with the offense of reckless discharge of a firearm." *People v. Grant*, 2017 IL App (1st) 142956, ¶ 24. "A plain reading of the statute reveals that the offense is two-pronged. A person commits the offense of reckless discharge of a firearm when he (1) recklessly discharges a firearm, and (2) endangers the bodily safety of an individual." *People v. Collins*, 214 Ill. 2d 206, 212 (2005).

¶ 28    The State has the burden to prove every element of the offense beyond a reasonable doubt, including the mental state required of the offense. See generally *People v. Smith*, 149 Ill. 2d 558, 565 (1992) (in prosecution for involuntary manslaughter, "[i]t is recklessness, not intoxication or any other fact underlying an inference of this mental state, that the State must prove beyond a reasonable doubt"); *People v. Platter*, 89 Ill. App. 3d 803, 821 (1980) ("While the State is not required to prove an intent to kill, it is still required to prove the existence of a mental state—in this case the mental state of recklessness."). "Recklessness may be inferred from all the facts and circumstances in the record, viewed as a whole ***." *Smith*, 149 Ill. 2d at 565.

> "Whether recklessness has been proved is an issue to be decided by the trier of fact. [Citation.] The critical inquiry when reviewing the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] A reviewing court must not substitute its judgment for that of the jury unless the inference of a mental state accepted by the jury was inherently impossible or unreasonable. [Citation.]" *Id.*

The inference to be drawn must be reasonable. *People v. Martin*, 401 Ill. App. 3d 315, 323 (2010). The State must present sufficient evidence from which the inference can be made "and any inference must be based upon established facts and not pyramided on intervening inferences." (Internal quotation marks omitted.) *People v. Nash*, 282 Ill. App. 3d 982, 985 (1996) (discussing mental state of knowledge).

¶ 29    In this case, defendant asserts "the State failed to present any evidence as to how [defendant] 'shot himself' in the leg, much less that he did so recklessly" or that he endangered anyone else. Defendant argues the State failed to present evidence to prove or from which it could reasonably be inferred that he acted with the requisite recklessness to prove the offense or that his conduct endangered another individual. The State responds "the evidence showed that at the moment defendant discharged the handgun he did so in the immediate presence of and close proximity to several other people." The State asserts that based on this evidence, "the trial court was well within its function to determined [*sic*] that defendant handled and

discharged the firearm in a reckless manner." The State further argues that the bodily safety of the individuals in close proximity to defendant was "clearly endangered" when defendant discharged the handgun. Defendant replies there was no testimony that the other individuals in the apartment were next to defendant when he discharged the gun.

¶ 30     Our inquiry concerning the first prong of the offense is whether the State proved defendant fired the gun recklessly beyond a reasonable doubt. *People v. Watkins*, 361 Ill. App. 3d 498, 501 (2005).

> "The reckless state of mind may be inferred from all of the facts and circumstances in the record. [Citation.] When recklessness has been found by the trier of fact, this determination should not be overturned unless inference of the mental state is inherently impossible or unreasonable. [Citation.] The State need not prove that the defendant shot a gun knowing that he may injure a particular person to show the defendant's reckless state of mind. [Citation.]" *Id.*

In *Watkins*, the stipulated evidence was that the defendant purposely fired a gun into the air approximately four times in a residential neighborhood. *Id.* at 500. The defendant stated: "I found the gun in the closet and just wanted to see how it worked. *** I just fired the gun into the air." (Internal quotation marks omitted.) *Id.* The court held this evidence "showed that the defendant consciously disregarded the substantial and unjustifiable risk that the bullets he fired into the air would endanger the bodily safety of others in a residential area" and that "his disregard for the safety of others constituted a gross deviation from the standard of care which a reasonable person would exercise in a residential neighborhood." *Id.* at 502. Because the "analysis of the reckless state of mind, as applied to the offense of reckless discharge of a firearm, [was] a matter of first impression," the court looked to "cases analyzing the reckless state of mind, as applied to other offenses, for analogous examples of reckless conduct." *Id.* at 501. The court held "the defendant's conduct was analogous to the level of disregard for the safety of others and failure to exercise care exhibited by a person merely pointing a gun at another, driving while speeding and weaving, or drawing a loaded gun in a crowded tavern." *Id.* at 502 (citing *People v. Lemke*, 349 Ill. App. 3d 391 (2004) (involuntary manslaughter); *People v. Testin*, 260 Ill. App. 3d 224 (1994) (reckless homicide); *People v. Thomas*, 8 Ill. App. 3d 690 (1972) (involuntary manslaughter)). In *Watkins*, the defendant purposely and voluntarily fired the gun into the air. *Id.* at 500. However, this court has found that where it is established that the defendant accidentally pulled the trigger, the evidence does not support a finding the defendant acted recklessly beyond a reasonable doubt. *People v. Olivieri*, 2016 IL App (1st) 152137, ¶ 30. "An accident is not to be equated with recklessness. [Citation.]" *Id.* ¶ 28.

¶ 31     Here, the evidence adduced at trial is insufficient to prove defendant acted recklessly beyond a reasonable doubt. The record contains no facts from which to reasonably infer defendant consciously disregarded a substantial and unjustifiable risk to the bodily safety of an individual. See *id.* ¶ 31. Gayton testified that when she arrived home defendant, her boyfriend Jerry, her cousin Gretchen, and one of their friends were in her apartment. When she arrived the people in the apartment were running from the area of two bedrooms. Defendant said to Gayton, "I'm shot, I'm shot." On cross-examination, Gayton testified she had never seen the gun before the night in question and, on that night, she never saw defendant pointing or aiming with the gun. Sergeant Nemcovic testified that when he questioned defendant, defendant "said that he apologized for lying to me the first time and that he did shoot himself or shot himself."

- 13 -

On cross-examination, Sergeant Nemcovic was asked, "So eventually when he did tell you what happened, did he tell you he accidentally shot himself?" Sergeant Nemcovic responded, "I believe he said, I'm sorry I lied the first time, I shot myself." The defense moved for a directed finding, in part, on the ground the State failed to adduce evidence of reckless conduct. Defendant's attorney argued: "It could have easily been presumed that he shot himself that this was accidental, not necessarily reckless." In denying the motion, the trial court stated:

> "An accident [and] reckless while not the same are the same state of mind. They are both unintentional. Reckless homicide is the unintentional killing of another human being. Obviously I take it by the evidence here that [defendant] unintentionally shot himself, not intentionally shot himself. There is no evidence of that so your motion for directed finding as to Count 2 is likewise denied."

¶ 32    As noted above this court has held that "[a]n accident is not to be equated with recklessness. [Citation.]" *Id.* ¶ 28. The State argues that "even accepting defendant's argument that the shooting was accidental (with which the trial court agreed)—this does not mean that it was not also reckless. Accepting that proposition *arguendo*, the State still must prove the conduct was also reckless. Regardless of whether defendant "unintentionally" shot himself, the inquiry is whether, in doing so, he consciously disregarded a substantial and unjustifiable risk to the bodily safety of an another individual. Here, as defendant points out, there is no evidence as to how he shot himself—he may have purposely and voluntarily pulled the trigger as in *Watkins*, or he may have been trying to unload the gun as in *Olivieri*. Additionally, there is no evidence defendant was handling the gun while impaired (*cf. People v. Franklin*, 189 Ill. App. 3d 425, 430 (1989) ("handling a gun while intoxicated is reckless conduct")) or during an altercation (*cf. Lemke*, 349 Ill. App. 3d at 400 ("pointing of a handgun in the direction of [another] during an altercation cannot be seen as an accident")). We also note there is no evidence of any "acts" by defendant from which to find the discharge of the gun was the natural product. *Cf. People v. Andersch*, 107 Ill. App. 3d 810, 818 (1982) (where defendant argued discharge of weapon during physical confrontation with victim was an accident, unconscious act, the court found that argument "confuses reckless conduct with the risks or results that are the natural products of such acts"); *People v. Perry*, 19 Ill. App. 3d 254, 257-58 (1974) (holding jury could have determined the defendant's conduct was reckless where the evidence was conflicting and included statements by the defendant that he pointed the gun and fired). "[T]here must be some evidence giving rise to a reasonable inference of defendant's guilt; the State may not leave to conjecture or assumption essential elements of the crime." (Emphasis and internal quotation marks omitted.) *People v. Smith*, 2014 IL App (1st) 123094, ¶ 15.

¶ 33    Viewing the evidence in the light most favorable to the State, including all reasonable inferences therefrom, the evidence is insufficient to establish that defendant acted recklessly when he shot himself. Finally, we also note there is absolutely no evidence in the record to prove when the shot was fired or that any "individual" was present in the apartment at the moment defendant shot himself. Therefore, the State also failed to prove the element of the offense that the bodily safety of an "individual" was threatened. Accordingly, defendant's conviction for reckless discharge of a firearm is reversed. See *Olivieri*, 2016 IL App (1st) 152137, ¶¶ 34-35.

¶ 34    The State's brief correctly states that defendant's mittimus erroneously reflects a two-year sentence, rather than a three-year sentence, for UUW. The transcript of the sentencing hearing

establishes that the trial court sentenced defendant to three years' imprisonment for UUW. The mittimus is ordered corrected to reflect defendant's proper sentence for UUW.

¶ 35                                    III. CONCLUSION

¶ 36        For the foregoing reasons, the circuit court of Cook County is affirmed in part and reversed in part, and the mittimus is ordered to be corrected.

¶ 37        Affirmed in part, reversed in part, mittimus corrected.